U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
APR 3 0 2025
AT_____ O'CLOCK
John M. Domurad, Clerk - Syracuse

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 5:25-CR-184 (BKS) |
| v. | Indictment |
| DEAN DELLAS, | Violations: 18 U.S.C. § 1343 [Wire Fraud] |
| Defendant. | 18 U.S.C. § 1028A(a)(1) [Aggravated Identity Theft] |
| | 7 Counts and Forfeiture Allegation |
| | County of Offense: Madison |

### THE GRAND JURY CHARGES:

1. At times material to this indictment, the defendant, **DEAN DELLAS**, was a resident of Cazenovia, New York.

2. Between approximately September 2008 and September 2013, **DELLAS** was a registered broker at Merrill Lynch, Pierce, Fenner & Smith Incorporated in Syracuse, New York ("Merrill Lynch"). Between approximately January 2009 and September 2013, **DELLAS** was a registered investment advisor representative of Merrill Lynch. **DELLAS** resigned from Merrill Lynch in approximately September 2013.

3. Between approximately September 2013 and February 2021, defendant **DEAN DELLAS** was a registered broker at Pinnacle Investments, LLC in Syracuse, New York ("Pinnacle"). Between approximately November 2016 and February 2021, **DELLAS** was a registered investment advisor representative of Pinnacle. **DELLAS**'s employment at Pinnacle ended on or about February 15, 2021.

4.     On or about February 19, 2021, **DELLAS** formed DSD Capital Management LLC ("DSD"), based in Cazenovia, New York. **DELLAS** carried out his investment advising and trading activities through DSD. Neither **DELLAS** nor DSD was registered as an investment advisor or a broker.

5.     While working at Merrill Lynch, **DELLAS** met WW, who held a retirement account at Merrill Lynch and who resided in Baldwinsville, New York. **DELLAS** became the broker and investment advisor for WW's accounts at Merrill Lynch. When **DELLAS** left Merrill Lynch, he persuaded WW to retain **DELLAS** as his investment advisor at Pinnacle. **DELLAS** persuaded WW to remain a client of **DELLAS**'s after the formation of DSD. WW advised **DELLAS** that WW wanted to continue the same investment strategy that had been used on WW's accounts at Pinnacle.

6.     In approximately March 2022, **DELLAS** persuaded BW, a family member of WW's who resided in Camillus, New York, to hire **DELLAS**, through DSD, as an investment advisor. BW's investment objectives were to preserve and grow the value of the accounts, and BW did not want to engage in high-risk trades.

7.     In approximately September 2023, **DELLAS** persuaded RB and SB ("R&SB"), family members of BW and WW who resided in Camillus, New York, to become investment clients of **DELLAS** and DSD.

## COUNTS 1 through 5
### [Wire Fraud]

8.     Paragraphs 1 through 7 are hereby realleged and incorporated by reference as if fully set forth herein.

**The Scheme to Defraud**

9.     Beginning no later than June 2021 through in or around November 2023, in Madison County in the Northern District of New York, and elsewhere, the Defendant, **DEAN DELLAS**, knowingly devised, intended to devise, and participated in a scheme to defraud WW, BW, and R&SB, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, as further described below.

**Manner and Means**

10.     At the direction and with the assistance of defendant **DEAN DELLAS**, WW and BW opened accounts at different brokers to allow **DELLAS** to trade and manage those accounts. More specifically, between approximately November 2020 and March 2023, WW held accounts, including the account ending in 7665, at Interactive Brokers LLC, a broker based in Connecticut ("Interactive Brokers"). BW held accounts ending in 0341 and 4387 at Interactive Brokers from approximately March 2022 to March 2023. From approximately March 2023 through in and around May 2023, WW and BW held accounts at TD Ameritrade, which was a broker headquartered in Nebraska. In and around May 2023, Charles Schwab Corporation, which was headquartered in Texas, acquired the TD Ameritrade accounts.

11.     **DELLAS** created online accounts for WW and BW that allowed online access to their investment accounts, including at Interactive Brokers, TD Ameritrade, and Charles Schwab. At times, **DELLAS** used the login credentials of WW and BW to sign in to their accounts without their knowledge and authorization. WW and BW also provided **DELLAS** with their personal email login credentials at his request.

12. **DELLAS** falsely and fraudulently told WW and BW that his advisor fee was 10% of the profits of their investment accounts, such that he would only make money if their accounts made money. WW and BW agreed to those terms. Despite these representations, **DELLAS** fraudulently induced WW and BW to affix their signatures and initials to paperwork authorizing **DELLAS** to take fees well in excess of that amount. **DELLAS** fraudulently induced WW and BW to sign this paperwork by presenting forms for signature with other papers covering all but the signature portions of the forms and by not explaining the terms and true nature of the forms. **DELLAS** subsequently submitted these signed forms to brokers to represent that he was authorized to collect those higher advisor fees.

13. On or about June 15, 2021, **DELLAS** induced WW to sign a form that gave **DELLAS** power of attorney for WW. **DELLAS** told WW that WW's signature on the form was required so that **DELLAS** could continue to trade in WW's accounts.

14. On or about July 7, 2021, **DELLAS** was added to WW's Interactive Brokers accounts as a "Trusted Contact." On or about July 29, 2021, **DELLAS** was added as an account controller, which granted him access to make trades and withdrawals within WW's accounts. From that point on, **DELLAS** conducted all account activity in WW's Interactive Brokers accounts.

15. On or about July 23, 2021, **DELLAS** opened an account at Bank of America ending in 2328 in the names of **DELLAS** and WW (hereinafter, the "Joint Account"). **DELLAS** listed a PO Box in Cazenovia, New York as the account address, and he opened the Joint Account without WW's knowledge and authorization. **DELLAS** never notified WW that the Joint Account existed.

16. Between July 2021 and March 2022, regardless of whether WW's accounts at Interactive Brokers earned a profit in any given statement period, and contrary to his promise to charge only 10 percent of account profits, **DELLAS** used his access to WW's account ending in 7665 to initiate monthly withdrawals via ACH transfer from that account into the Joint Account. **DELLAS** subsequently transferred nearly all the funds from the Joint Account into **DELLAS**'s personal Bank of America account ending in 7773, all without WW's knowledge and authorization.

17. The withdrawals that **DELLAS** took from WW's Interactive Brokers account ending in 7665 without WW's knowledge constituted taxable distributions. To conceal the fact of these withdrawals from WW, **DELLAS** offered to prepare WW's federal and state income tax returns for tax year 2021. WW agreed. On or about April 19, 2022, **DELLAS** (a) paid WW's federal tax owed, in the amount of $8,621, using funds from the Joint Account and (b) paid WW's state income tax owed, in the amount of $2,846, by check written on a Bank of America account held by DSD. **DELLAS** did not advise WW that WW owed taxes or that **DELLAS** had paid the taxes owed on WW's behalf.

18. Beginning in and around March 2022, when **DELLAS** became BW's financial advisor, **DELLAS** fraudulently induced BW and WW to execute paperwork authorizing **DELLAS** to receive advisor fees, which Interactive Brokers would take from their accounts.

19. On or about March 30, 2022, **DELLAS** caused BW to sign an account application to open an Interactive Brokers account ending in 4387. When **DELLAS** presented the application to BW, it was pre-filled and only required her signatures and initials. **DELLAS** did not explain the application to BW before collecting her signatures, even though its terms contradicted the investment goals and compensation that **DELLAS** had previously discussed

with BW. Instead, **DELLAS** included contrary provisions in the account application. For example, **DELLAS** selected that BW's investment objectives included "profits from active trading and speculation" which involved higher investment risk than BW wanted for her accounts. **DELLAS** failed to advise BW of the higher risk associated with these forms of investing. The account application also provided, contrary to **DELLAS**'s prior representations to BW, that DSD's advisor fee was 3% of the monthly account value, and 30% of the profit applied quarterly. On or about March 30, 2022, **DELLAS** emailed to Interactive Brokers the application of BW for the account ending in 4387.

20. On or about April 5, 2022, **DELLAS** added an additional advisor's fee to BW's accounts ending in 4387 and 0341 without BW's knowledge and authorization, which permitted DSD to invoice up to an additional $30,000 per month from each account regardless of account performance.

21. On or about May 12, 2022, **DELLAS** fraudulently induced WW to sign a form purportedly agreeing to pay the following advisor fees to **DELLAS** through DSD from the account ending in 7665: (a) a fixed 3% monthly fee; (b) a quarterly fee of 30% of profits; and (c) up to $30,000 per month in additional fees. On or about May 13, 2022, **DELLAS** emailed to Interactive Brokers the fee change approval form WW had signed.

22. Between approximately June 2021 and March 2023, **DELLAS** took approximately $193,802 from WW's Interactive Brokers IRA account through advisor fees and transfers. As a result of these unauthorized payments and **DELLAS**'s trading activity, WW's Interactive Brokers account lost approximately $420,526 during this same period.

23. Between approximately April 2022 and March 2023, **DELLAS** took approximately $76,294 in advisor fees from BW's Interactive Brokers account ending in 4387.

6

During that same period, because of these unauthorized payments and **DELLAS**'s trading activity, this account lost approximately $163,102.

24. Between approximately April 2022 and March 2023, defendant **DEAN DELLAS** took approximately $236,395 in advisor fees from BW's Interactive Brokers account ending in 0341. During that same period, because of these unauthorized payments and **DELLAS**'s trading activity, this account lost approximately $466,615.

25. In and around April 2023, **DELLAS** caused requests to be submitted to TD Ameritrade requesting that trade authority be granted to **DELLAS** for the accounts of WW and BW. These requests falsely indicated that **DELLAS** was not being compensated for providing investment advice, placing trades, and otherwise managing the account, and that his relationship to BW and WW was as a friend.

26. Between approximately March 2023 and October 2023, **DELLAS** took approximately $135,482 in advisor fees from BW's TD Ameritrade account ending in 7583. During that same period, because of these unauthorized payments and **DELLAS**'s trading activity, this account lost approximately $252,801.

27. WW and BW advised **DELLAS** that they preferred to receive paper account statements delivered by mail rather than electronically. To conceal the unauthorized fees and withdrawals that **DELLAS** took from their accounts, **DELLAS** changed their account settings to request electronic delivery of account statements and other documents rather than delivery by mail. **DELLAS** knew that BW and WW would be less likely to view their account statements electronically, given their preference for paper statements.

28. On or about August 16, 2022, **DELLAS** used BW's login credentials to sign into BW's Interactive Brokers account, without BW's knowledge and authorization. Using that

online account, **DELLAS** sent a message to Interactive Brokers, writing as BW, asking that Interactive Brokers not send any paper statements for the accounts ending in 0341 and 4387. Among other things, **DELLAS** wrote, "Please DO NOT send me any paper statements in the mail," and "Please confirm, no quarterly or paper account statements with any sensitive information be sent through the mail to me, ever." **DELLAS** knew that this was contrary to BW's actual preferences and sent this message without BW's knowledge and authorization.

29. On or about September 8, 2023, **DELLAS** initiated a wire transfer in the amount of $31,069.35 from BW's TD Ameritrade account ending in 7583 to a Bank of America account ending in 6281, which was in DSD's name and which **DELLAS** controlled.

30. On or about September 27, 2023, R&SB signed a form at **DELLAS's** request, which granted **DELLAS** trading and withdrawal authorization for R&SB's account at Charles Schwab ending in 1066. **DELLAS** also signed the form as the agent. **DELLAS** falsely indicated on that form that **DELLAS** was not being paid for providing investment advice on that account or any other Schwab account.

31. On or about October 20, 2023, **DELLAS** transferred approximately $8,951 from R&SB's Schwab account ending in 1066 to a Schwab account in **DELLAS's** name ending in 1028, without the knowledge and authorization of R&SB. On or about the same day, **DELLAS** transferred approximately $8,000 from his Schwab account ending in 1028 to an Axos Bank account he controlled ending in 0016.

32. On or about October 25, 2023, **DELLAS** used BW's login credentials to sign into BW's account at TD Ameritrade. **DELLAS** used that access to respond to a message that TD Ameritrade had sent to BW regarding concerns with activity occurring in BW's TD Ameritrade account ending in 7583. TD Ameritrade requested that BW provide information regarding the

8

investment objectives for the account, the purpose of certain third-party wire withdrawals sent to a Bank of America account held by DSD, and BW's relationship with **DELLAS**. **DELLAS** responded to the message using BW's account and signed the response with BW's name. In the response, **DELLAS** wrote, among other things, that "The investment objectives are speculative trading, growth, and income during periods of market uncertainty;" "The wire transfers submitted [to DSD's Bank of America account] were part of a purchase obligation;" and "Dean Dellas is a trusted family confidant." **DELLAS** knew that these statements were false, and he sent the message without BW's knowledge and authorization.

33. On or about November 14, 2023, **DELLAS** fraudulently attempted to withdraw approximately $400,000 from BW's Charles Schwab account ending in 3901 to **DELLAS**'s Bank of America account ending in 7773.

## The Wirings

34. On or about each of the dates set forth below, in Madison County in the Northern District of New York, and elsewhere, the Defendant, **DEAN DELLAS**, for the purpose of executing the scheme and artifice to defraud described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below, each transmission constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 1 | March 30, 2022 | Email from **DELLAS** to Interactive Brokers with attached Account Application of client BW for the account ending in 4387 |
| 2 | May 13, 2022 | Email from **DELLAS** to Interactive Brokers with attached Fee Change Approval form for client WW's account ending in 7665 |
| 3 | September 8, 2023 | Wire transfer of approximately $31,069.35 from client BW's TD Ameritrade account ending in 7583 into DSD Bank of America account ending in 6281 |

| 4 | October 20, 2023 | Transfer of approximately $8,000 from Schwab account ending in 1028 to Axos Bank account ending in 0016, after fraudulently transferring the funds from R&SB Schwab account ending in 1066 |
| 5 | November 14, 2023 | Wire transfer request seeking approximately $400,000 from client BW's Charles Schwab account ending in 3901 to **DELLAS**'s Bank of America account ending in 7773. |

In violation of Title 18, United States Code, Section 1343.

## COUNTS 6 and 7
### [Aggravated Identity Theft]

35. Paragraphs 1 through 34 are hereby realleged and incorporated by reference as if fully set forth herein.

36. On or about the date specified as to each count below, in the Northern District of New York and elsewhere, the Defendant, **DEAN DELLAS**, during and in relation to a felony violation contained in Chapter 63 of Title 18 of the United States Code, that is a violation of Title 18, United States Code, Section 1343 (wire fraud), knowingly possessed and used, without lawful authority, a means of identification of BW, that is the name and account user name of BW, during and in relation to the felony offense of wire fraud, all in violation of Title 18, United States Code, Section 1028A(a)(1).

| Count | Approximate Date |
|---|---|
| 6 | August 16, 2022 |
| 7 | October 25, 2023 |

## FORFEITURE ALLEGATION

The allegations contained in Counts 1 through 5 of this indictment are incorporated here for the purposes of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) by Title 28, United States Code, Section 2461(c).

Upon conviction of one or more offenses in violation of Title 18, United States Code, Section 1343, as set forth in Counts 1 through 5 of this indictment, the Defendant, **DEAN DELLAS**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) by Title 28, United States Code, Section 2461(c), all right, title and interest in any property constituting, and derived from, proceeds obtained directly and indirectly, as a result of such violation. The property to be forfeited includes, but is not limited to, a money judgment in an amount no less than $641,975.59 in U.S. currency.

### Substitute Assets

If any of the property described above, as a result of any act or omission of the defendants:

a) cannot be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third party;

c) has been placed beyond the jurisdiction of the Court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

Dated:  April 30, 2025

A TRUE BILL,

_____
Grand Jury Foreperson
*Foreperson name redacted

JOHN A. SARCONE III
United States Attorney

By: _____
MATTHEW J. McCROBIE (Bar Roll No. 702739)
MICHAEL F. PERRY (Bar Roll No. 518952)
Assistant United States Attorneys